# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | CASE NO.: 1:05CR204 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Ernest Matthews, | ) | |
| | ) | |
| Defendant. | ) | |

Pending before the Court is a determination of whether Defendant Ernest Matthews has violated the terms of his supervised release by engaging in drug trafficking. The Court finds that Matthews has violated the terms of his release and will schedule a sentencing hearing as appropriate.

A district court may revoke a term of supervised release if it finds by a preponderance of the evidence that the defendant violated the terms of supervision. *See* 18 U.S.C. § 3583(e)(3); *United States v. Lowenstein*, 108 F.3d 80, 85 (6th Cir.1997). The evidence detailed clearly establishes by a preponderance of the evidence the conclusion that Matthews has continued to engage in drug trafficking during the term of his supervised release. The Court's conclusion is supported by three separate incidents that are detailed below.

Matthews was convicted of possession with intent to distribute marijuana following a jury trial that concluded on September 19, 2005. Following lengthy post-trial motion practice, Matthews was sentence on January 17, 2007 to a term of incarceration of

1

120 months to be followed by 8 years of supervised release. Matthews began his supervised release on May 10, 2013.

The Court heard evidence during these proceedings that just months after his release, Matthews was soon again mixed up in the world of marijuana trafficking. Officer Aaron Petitt of the Cleveland Police Department offered testimony regarding a traffic stop that occurred on September 6, 2013, less than 4 months after Matthews was released from prison. Petitt testified that he was assisting an Officer Sanderson that had pulled over a vehicle. Sanderson relayed to Petitt that he had smelled marijuana coming from the vehicle and searched it as a result. The search of the vehicle revealed five individually packaged bags of marijuana and $5,000 cash. As a result of the traffic stop, Matthews was arrested and charged with trafficking in drugs and possession of criminal tools. However, it does not appear from the record that Matthews was ever formally indicted for this incident. The record suggests that the other individual in the vehicle, Marc Thomas, claimed ownership of the marijuana and a bulk of the cash. Matthews, however, claimed ownership of $1,568 in cash that was not found in the glovebox with the marijuana.

Postal Inspector Brian Green gave testimony about an incident that occurred in July of 2014. Green received a call from the post office in Cleveland regarding a television that was scheduled to be sent to Daly City, California. The postal manager believed the package was suspicious because the postage was more costly than the television itself. Green examined the package and ultimately received a warrant to search its contents. Upon searching the package, Green found $95,000 in U.S. currency. Green then repackaged the television and contacted the sender, Pamela Fowlkes. When Fowlkes

retrieved the package, she was followed by law enforcement. Roughly two to three hours after she returned home, law enforcement knocked on Fowlkes' door. During questioning, Fowlkes indicated that an individual named Juice had asked to her mail the package. Fowlkes then gave consent for her phone to be searched. Text messages on her phone from a contact named Baby led to further police questioning. At that time, Fowlkes indicated that Matthews had asked her to send the package. Fowlkes indicated that she was dating Matthews and had met him while he was in federal prison.

When asked about the contents of the parcel, Fowlkes told Green that she believed the parcel contained $10,000 for the purchase of marijuana. Fowlkes also told Green that in the months prior to her arrest, Matthews had requested that she mail three other televisions all containing cash for the purchase of marijuana. Green's investigation indicated that the television had been purchased from Walmart. Thereafter, Green was able to obtain a receipt for the television and review security camera footage of the time of the purchase. Green positively identified Matthews on the video as the individual that purchased the television.

Finally, the Court heard testimony related to an event that occurred on May 22, 2018. Ohio State Highway Patrolman Justin Schell. Schell initiated a traffic stop on a vehicle being driven by Matthews based on his failure to use a turn signal. Matthews was exiting the vehicle as Schell approached. As he approached, Schell noticed a smell of marijuana coming from the vehicle. As a result, he placed Matthews in handcuffs. As Schell was placing Matthews into the backseat of his cruiser, a female at the resident ran to the car. The female reached into the open driver's door, obtained the keys, locked the vehicle, and ran back inside. After 45 minutes of attempting and failing to open the

locked vehicles, other individuals at the home convinced the female that had approached the car to unlock it. A search of the vehicle revealed a marijuana cigar sitting on the armrest, four bags of marijuana in the center console armrest, and two large bags of marijuana in the backseat covered by a hooded sweatshirt. One of the larger bags was tested and confirmed to be marijuana weighing 443 grams.

Matthews take a similar tact in his attack on each of the above incidents. With respect to the 2013 incident, Matthews points the finger at the other occupant of the vehicle, Marc Thomas. Moreover, Matthews asserts that he only laid claim to the currency in the vehicle that was *not* found with the marijuana. With respect to the 2014 incident, Matthews claims that nothing independently verified the information provided by Fowlkes to the postal service. Finally, with respect to the 2018 incident, Matthews offered the testimony of Josephus Robinson. Robinson testified that he had borrowed a car from his brother on the day of the traffic stop. Robinson asserted that he took the car and bought 2 pounds of marijuana. Robinson asserted that the drugs were contained in 2 bags that would ordinarily be used to cook a turkey in an oven. Robinson claims that he took the marijuana, wrapped it in his sweatshirt, and placed in the backseat of the car. Robinson also asserted that the marijuana found in the console of the vehicle was his "personal weed." On his way back home, Robinson stopped at his cousin Destiny's house and left all the marijuana in the vehicle.

Robinson continued that when he arrived at his cousin's house, he was forced to park behind numerous other vehicles. As a result, while at the home, Robinson was approached by Matthews who needed to go to a local store. Robinson allowed Matthews to drive his vehicle. Upon seeing Matthews speaking to police when he returned to the

4

home, Robinson asked his cousin to run out to the car and lock the doors. According to Robinson, he never told Matthews anything about the existence of the marijuana in the vehicle.

Taken in isolation, it is conceivable that one could accept Matthews' apparent view that he was simply in the wrong place at the wrong time. However, his repeated reliance on such an argument makes his theory implausible. To believe Matthews, the Court would be required to believe that he is time and time again just a hair's width away from marijuana trafficking without any knowledge of it. The Court will examine such a claim for each incident.

With respect to the 2013 incident, Matthews has never explained how it is that he was carrying nearly $1600 in currency in the vehicle merely 4 months after he was released from a lengthy prison sentence. Moreover, the Court finds it less-than-plausible that both Matthews and Thomas were both carrying such substantial sums of cash in the vehicle and that only of them was engaged in drug activity.

Matthews' challenge to the 2014 incident carries even less force. Matthews seems to assert two things: 1) officers misidentified the woman he was with when he purchased the television, and 2) no charges were brought against Fowlkes. Matthews suggest that these facts demonstrate that he was improperly connected to the incident and that Fowlkes was a less-than-reliable witness. Matthews' assertions, however, ignore certain features of the investigation. First and foremost, the television that Matthews purchased was the same make and model that was seized from Fowlkes. Moreover, regardless of who accompanied Matthews to the store, Postal Inspector Green positively identified Matthews as the purchased of the television.

It is somewhat unclear what conclusion Matthews believes should be drawn from the evidence. Fowlkes claims that Matthews, a felon previously convicted for trafficking in marijuana, asked her to send three or four televisions to California stuffed with money for the purchase of marijuana. It is undisputed from the evidence before this Court that the final television, filled with $95,000 in U.S. currency, was purchased by Matthews. Matthews' assertion that the Court should simply discredit any information obtained through Fowlkes has no basis in fact. He has not provided any information that would suggest Fowlkes did not provide truthful information.

Finally, the Court must address Robinson's testimony. To be blunt, Robinson lacked any credibility as a witness. While Robinson asserted on direct testimony that he was attempting to accept responsibility for the marijuana found in the car because it was his marijuana, cross-examination discredited his testimony. On cross, Robinson asserted that he bought the marijuana from "an old friend" that he knew as Fish. Robinson could not provide a last name for this alleged drug supplier. Robinson also did not know the address where he purchased the marijuana, nor did he know the phone number of this "old friend" that sold him the drugs. Robinson also asserted that he had bought marijuana from this same person three or four times before but "no pounds or anything like that" before. Doc. 283 at 21. When asked why he purchased such a large amount, Robinson stated "I really just rented out an apartment, and I just wanted to pay my bills." Doc. 283 at 22. Robinson asserted that he paid $3,000 for the drugs.

To believe Robinson, the Court would be required to believe that he purchased $3,000 worth of marijuana from an individual he knew only as Fish, whose phone number and address he did not know. He then drove the car containing the marijuana to

6

his cousin's house. He then allowed Matthews to drive the car without ever informing him that it had more than $3,000 worth of drugs in the backseat and the center console. The Court would also have to accept that when Robinson decided to borrow the car for the specific purpose of buying marijuana, he also thought to grab his own personal stash of marijuana and place it in the center console of the borrowed vehicle. In short, Robinson's testimony has all the hallmarks of a relative with a cleaner record attempting to take the blame for someone facing a stiffer penalty. In any event, the Court finds that Robinson's testimony wholly lacked credibility.

The three incidents above demonstrate that time and time again Matthews finds himself at the center of activity that includes marijuana trafficking. The evidence presented demonstrates by a preponderance of the evidence that Matthews has violated the terms of his supervised release by engaging in marijuana trafficking. Accordingly, the Court hereby finds that Matthews has violated his supervised release. Sentencing will proceed at a hearing set by the Court.

IT IS SO ORDERED.


April 27, 2020                              */s/ Judge John R. Adams*
                                            JUDGE JOHN R. ADAMS
                                            U.S. DISTRICT COURT